**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

GALE K. NORDLING,                                        Civil No. 20-337 (JRT/LIB)

Plaintiff,

v.                                                       **MEMORANDUM OPINION AND ORDER**
                                                         **DENYING PLAINTIFF'S MOTION TO**
                                                         **REMAND AND GRANTING DEFENDANTS'**
NORTHERN STATES POWER COMPANY, *a*                       **MOTIONS TO DISMISS AND FOR**
*Minnesota corporation*, and XCEL ENERGY                 **SUMMARY JUDGMENT**
INC., *a Minnesota corporation, individually*
*and as successor in interest to Northern*
*States Power Company*,

Defendants.

---

Thomas D. Jensen, **LIND JENSEN SULLIVAN & PETERSON, PA,** 901
Marquette Avenue South, Suite 1300, Minneapolis, MN 55402, for plaintiff;

Andrew J. Holly, Margaret Fitzpatrick, & Stephen P. Lucke, **DORSEY &**
**WHITNEY LLP,** 50 South 6th Street, Suite 1500, Minneapolis, MN 55402, for
defendants;

Plaintiff Gale Nordling commenced this breach-of-contract, declaratory judgment,

and Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.,* action

in state court seeking recovery of benefits under the terms of Defendants Northern States

Power Company ("NSP") and Xcel Energy Inc.'s ("Xcel") ERISA-related plan and

enforcement of a Settlement Agreement from a prior state court action.  Defendants

removed to this Court and filed a Motion to Dismiss and for Summary Judgment pursuant

to Federal Rules of Civil Procedure 12 and 56, arguing the state law claims are preempted by ERISA and the ERISA claim should be denied as a matter of law.  Plaintiff opposed Defendants' motion and filed a Motion to Remand, arguing that the Court lacks subject matter jurisdiction.

The Court will deny Plaintiff's Motion to Remand because Nordling's Complaint facially satisfies the well-pleaded complaint rule as it pleads a federal action under ERISA § 502. The Court will also grant Defendants' Motion to Dismiss pursuant to 12(b)(6) because Nordling's state law claims are preempted by ERISA, and will grant Defendants' Motion for Summary Judgment pursuant to Rule 56 because the committee's decision to deny Nordling the "Pension Make-up" benefit was reasonable.

## BACKGROUND

### I.   FACTUAL BACKGROUND

#### A.  The Parties

Nordling is a resident of Minnesota and a former employee of Defendant NSP. (Notice of Removal ¶ 1, Ex. A ("Compl.") ¶¶ 2, 4, Jan. 24, 2020, Docket No. 1-1.)

NSP and Xcel are Minnesota corporations, each with their principal place of business located in Hennepin County, Minnesota.  (*Id.* ¶ 4.)  Xcel merged with NSP in 2000, making NSP a subsidiary of Xcel and making Xcel NSP's successor in interest.  (*Id.*)

**B.  Nordling's Employment at NSP and Participation in Benefit Plans**

Nordling began working for NSP as an attorney in its legal department in 1975. (*Id.* ¶ 6.)  While employed at NSP, Nordling participated in various benefit programs, including NSP's defined pension program and Deferred Compensation Plan. (*Id.*)

Under the Deferred Compensation Plan, certain employees were allowed to defer a portion of their yearly salary and put it towards retirement.  (*Id.*)  Participants enjoyed reduced income tax exposure on the deferred salary while receiving pretax interest on the deferred funds.  (*Id.*)  Participants could hold accounts in the "Regular Deferred Compensation" plan or the "Wealth-Op Deferred Benefit" addendum.  (Nordling Decl. ¶ 8, Ex. B ("Deferred Compensation Plan") at 5, § 4, Feb. 24, 2020, Docket No. 20-2.)  The Deferred Compensation Plan and its Wealth-Op addendum, but not the defined pension program, are what are colloquially known as "top hat" plans because they "provid[e] 'deferred compensation for a select group of management or highly compensated employees,' without being subject to the Internal Revenue Code's maximum annual benefit and compensation limits." *Craig v. Pillsbury Non–Qualified Pension Plan*, 458 F.3d 748, 749 (8th Cir. 2006) (citation omitted) (quoting 29 U.S.C. § 1051(2)) (Deferred Compensation Plan at 3–4, §§ 2-3.)

Deferring compensation, however, also carried a downside: under the defined pension plan, an employee's pension was calculated by taking a percentage of the

employees' five highest earning years, excluding the deferred portion of an employee's salary for those participating in either top hat plan. (Compl. ¶ 8.)

For Regular Deferred Compensation account holders, NSP made up for the resulting deficiency in pension by offering a "Pension Make-Up" benefit. (Deferred Compensation Plan at 9, § 7(A).) Section 7(A) of the Deferred Compensation Plan states that "[t]o avoid any significant reduction in the value of a Participant's overall retirement benefits because of an election to defer compensation, [NSP] shall increase deferred earnings by increasing a Participant's Regular Deferred Compensation Account as provided in this Section." (*Id.*) Section 7(C) then states that NSP will provide retirees with an annuity payment adjustment equal to the difference between the monthly annuity the retiree would have been entitled to had deferral not occurred compared to what the employee was actually entitled to receive with the deferral. (*Id.* at 11, § 7(C).) In other words, for Regular Deferred Compensation account holders, NSP would essentially consider the deferred salary as part of its pension calculations when it paid out the account holder's pension.

Though the Pension Make-Up Benefit was offered to Regular Deferred Compensation account holders, both the Deferred Compensation Plan and the Wealth-Op Plan terms explicitly state that Section 7 did not apply to Wealth-Op Deferred Benefit accounts. (*See* Nordling Decl. ¶ 9, Ex. C ("Wealth-Op Plan") at 4, Feb. 14, 2020, Docket No. 20-3.; Deferred Compensation Plan at 5–6, § 4 ("Amounts credited to [Wealth-Op

Plan] shall not be subject to Sections 5, 6, 7, and 8 but are governed by the provisions of the [Wealth-Op Plan].”))

Wealth-Op account holders were given a higher rate of interest than Regular Deferred Compensation account holders; the monthly average of Moody's Seasoned Corporate Bond Yield Index plus 3% per annum.  When the employee retired, the Wealth-Op money was to be paid out to the employee monthly over a 15-year period.  The Wealth-Op plan also stated that upon termination of employment, all deferred compensation held in a Wealth-Op account would automatically be transferred to a Regular Deferred Compensation account.  (Wealth-Op Plan at 14–15, § W6.)

From 1984 to 1987, Nordling participated in the Deferred Compensation Plan, held a Wealth-Op account during those years, and deferred $20,000 of his yearly salary each year.  (Compl. ¶ 10; Nordling Decl. ¶ 3.)

### C.  Nordling's Termination, State-Action, and Settlement Agreement

Nordling was terminated from NSP in 1987.  (Nordling Decl. ¶ 5.)  Upon his termination, his Wealth-Op account was transferred into a Regular Deferred Compensation account, consistent with the terms of the Wealth-Op Plan.  (Decl. of Deborah A. Robin (“Robin Decl.”) ¶ 5, Ex. D at 2, 5, 7, Feb. 27, 2020, Docket No. 28-4.)

Nordling filed a state-based wrongful termination and tort action that was settled in June of 1992.  Relevant here, the Settlement Agreement states that

> NSP . . . agrees to reinstate Nordling in the NSP Deferred Compensation Plan referred to as Wealth-Op. (referred to herein as 'Wealth-Op I') for any and all benefits he is entitled to under Wealth-Op I . . . as if he never left the employment of NSP. . . . [and to] credit retroactively Nordling's account with timely deferrals and interest as if he had never left NSP.

(Nordling Decl. ¶ 6, Ex. A ("Settlement Agreement") ¶ 7, Feb. 24, 2020, Docket No. 20-1.) Thus, according to the terms of the settlement, the vast majority of Nordling's funds that had been transferred to a Regular Deferred Compensation account ($91,685 in principal and $87,299.69 in interest) were transferred back to his Wealth-Op account. (Robin Decl. ¶ 5, Ex. D at 14.) Only $412.28 was left in a Regular Deferred Compensation account. (*Id.*)

On August 19, 1992, an internal NSP memo stated that the "intent of the Nordling Wealth-Op I stipulation is to allow only his original Wealth-Op election to continue in the plan to completion" and noted that it did not include a make-up contribution under Section 7 of the Deferred Compensation Plan. (*Id.* at 13.)

**D. Retirement and Events Leading Up to Current Action**

In 2014, upon attaining the age of 65, Nordling began receiving his annuity payments under the Wealth-Op Plan and separate defined pension plan payments. (*Id.* at 24; Nordling Decl. ¶ 7.)

Sometime in early 2019, Nordling realized he was not receiving the "Pension Make-Up" benefit he believed he was entitled to under the Wealth-Op Plan. (Robin Decl. ¶ 5, Ex. D at 24–25.) On April 10, 2019, Nordling sent a letter to Xcel—NSP's successor in

interest—requesting that the company rectify this problem and provide Nordling with the proper Pension Make-Up benefit for his participation in the Wealth-Op Plan.  (*Id.*)

On July 15, 2019, Xcel informed Nordling via letter that the Plan administrator reviewed Nordling's request and, while finding that his spouse—or whomever he named as a beneficiary—would be eligible to receive the remainder of his Wealth-Op benefits if he were to pass before they were extinguished, Nordling was ineligible for the Pension Make-Up benefit.  (*Id.* at 35.)

On August 20, 2019, Nordling sent a letter to Xcel disputing the plan administrator's finding.  (*Id.* at 36–38.)

On October 25, 2019, the plan administrator's decision was reviewed by "the committee that has responsibility for reviewing adverse benefit determinations under the company's ERISA benefit plans."  (*Id.* at 42.)  The committee denied Nordling's claim for four reasons: (1) that Nordling exceeded some unidentified statute of limitation for submitting a benefit claim; (2) that the binding Settlement Agreement did not include any reference to the Pension Make-Up benefit; (3) company records do not list Nordling as eligible for a Pension Make-Up benefit; and (4) the papers provided to Pension Make-Up participants in the early 1990s clearly include reference to a Pension Make-Up benefit and Nordling could not produce any similar papers.  (*Id.* at 42–43.)  The Committee also noted that it reviewed § 7(E) of the Deferred Compensation Plan—not the Wealth-Op Benefit Addendum plan—and found that, because Nordling was terminated for reasons

other than retirement or death, it was up to the discretion of Xcel whether to provide

Nordling with a Pension Make-Up benefit.  (*Id.* at 43.)  In relevant part, Section 7(E) states

that

> [t]he Company has the sole discretion to establish the method
> of determining the amount of adjustments to Regular
> Deferred Compensation Accounts required by this
> Section . . . .  No adjustments to the Regular Deferred
> Compensation Account of a Participant whose deferral period
> ends for a reason other than retirement or death are required
> under Section 7(C) or Section 7(D) . . . .

(*Id.* at 43 (quoting Deferred Compensation Plan § 7(E)).)

## II.    PROCEDURAL HISTORY

On December 27, 2019, Nordling commenced this action in state court by serving

Xcel with a copy of the Summons and Complaint.  (Notice of Removal ¶ 1.)  Nordling seeks

to recover damages for the loss of the Pension Make-Up benefit he believes he is entitled

to as part of the Settlement Agreement he signed in 1992.  Nordling alleges three counts:

(I) a declaration pursuant to the Minnesota Declaratory Judgment Act Minn. Stat. §§

555.02–555.03 that under the Settlement Agreement, Nordling is entitled to the Pension

Make-Up benefit established by the Deferred Compensation Plan; (II) breach-of-contract

related to the Settlement Agreement for Defendants' refusal to pay the Pension Make-

Up benefit allegedly owed to him via the Deferred Compensation Plan; and (III) a claim to

recover benefits under federal law pursuant to the Employee Retirement Income Security

Act ("ERISA") § 502(a)(1)(B) (29 U.S.C. 1132(a)(1)(B)).  (Compl. ¶¶ 18, 22, 25.)

On January 24, 2020, Defendants removed the case to this Court arguing that the Court has subject matter jurisdiction under ERISA, § 502(e)(1) (29 U.S.C. § 1132(e)(1)). (Notice of Removal ¶ 3.)

On February 24, 2020, Nordling filed a Motion to Remand, arguing that the Court lacks ERISA subject matter jurisdiction and all of his claims stem from the Settlement Agreement, which is not an ERISA plan. (Mot. to Remand, Feb. 24, 2020, Docket No. 19.)

On February 27, 2020, Defendants filed a Motion for Summary Judgment under Fed. R. Civ. P. 56(a) on Count III and a Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) on Counts I and II. (Mot. to Dismiss/General, Feb. 27, 2020, Docket No. 25.)

## DISCUSSION

### I.   MOTION TO REMAND

#### A.  Standard of Review

A defendant may remove a civil action to federal court only if the action could have been filed originally in federal court.  *See* 28 U.S.C. § 1441(a)–(b); *Gore v. Trans World Airlines*, 210 F.3d 944, 948 (8th Cir. 2000).  The party seeking removal bears the burden of demonstrating that removal was proper, and "all doubts about federal jurisdiction must be resolved in favor of remand."  *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 561 F.3d 904, 912 (8th Cir. 2009) (internal citation omitted).

Here, Defendants allege removal was proper based on federal question jurisdiction. Normally federal question jurisdiction is governed by the "well-pleaded complaint rule" requiring a complaint to facially state a federal cause of action. *Griffioen v. Cedar Rapids & Iowa City Ry. Co.*, 785 F.3d 1182, 1188 (8th Cir. 2015).

An exception to the well-pleaded complaint rule exists when Congress "wholly displaces the state-law cause of action through complete pre-emption." *Aetna Health Inc. v. Davila*, 542 U.S. 200, 207 (2004) (quoting *Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003)). ERISA governs certain employee benefit plans and is one such statute in which Congress intended to fully pre-empt state law. *Id.* at 209 ("[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted.").[1] The ERISA civil enforcement clause, § 502(a)(1)(B) (29 U.S.C. 1132(a)(1)(B)), operates with "such extraordinary pre-emptive power that it converts an ordinary state common law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Id.* (cleaned up) (quoting *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65–66 (1987)). Thus, Congress intended ERISA's preemptive power

---

[1] *See also Treasurer, Trs. of Drury Indus., Inc. Health Care Plan & Tr. v. Goding*, 692 F.3d 888, 897 (8th Cir. 2012) ("ERISA's preemption provision states its enforcement provisions shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title." (quotation omitted)).

to be read broadly,[2] and any action that falls within § 502(a)'s ambit is removable to federal court.  *Id.*

A state-law claim falls under § 502(a) whenever, "the individual is entitled to [a benefit] only because of the terms of an ERISA-regulated employee benefit plan, and where no legal duty (state or federal) independent of ERISA or the plan terms is violated." *Treasurer, Trs. of Drury Indus., Inc. Health Care Plan & Tr. v. Goding*, 692 F.3d 888, 897 (8th Cir. 2012) (quoting *Davila*, 542 U.S. at 210).  "In other words, if an individual, at some point in time, could have brought his claim under ERISA § 502(a)(1)(B), and where there is no other independent legal duty that is implicated by a defendant's actions, then the individual's cause of action is completely preempted by ERISA § 502(a)(1)(B)." *Id.* (quoting *Davila*, 542 U.S. at 210)  In making such a determination, the Court should consider the complaint, the law or documents upon which the claim allegedly arises, and the plan documents.  *See Davila*, 542 U.S. at 211 ("To determine whether respondents' causes of action fall 'within the scope' of ERISA § 502(a)(1)(B), we must examine respondents' complaints, the statute on which their claims are based . . . , and the various plan documents.").

---

[2] *See id.* ("Congress intended courts to read [the ERISA pre-emption] provision broadly, in order to protect ERISA's 'uniform regulatory regime over employee benefit plans.'" (quoting *Davila*, 524 U.S. at 208)).

**B.  Analysis**

Counts I and II of Nordling's complaint raise state-law claims while Count III raises an ERISA claim under § 502(a)(1)(B).

Because Nordling's Complaint facially states a cause of action arising under federal law in Count III, the Complaint satisfies the well-pleaded Complaint rule and removal is proper.  *See Davila*, 542 U.S. at 207.[3]

And even if the Complaint did not include a federal cause of action, removal would be proper because Nordling's state-law claims included in Counts I and II are preempted by ERISA because those counts are simply "seeking to enforce rights under ERISA." *Dakota, Minn. & E. R.R. Corp. v. Schieffer*, 711 F.3d 878, 881 (8th Cir. 2013).  Though Nordling argues his rights to the Pension Make-Up benefit emanate from the Settlement Agreement (a non-ERISA regulated plan), that agreement states only that Nordling is entitled to benefits according to the terms of the ERISA-regulated Wealth-Op Plan.  The Settlement Agreement, in this respect, therefore implicates no independent legal duty. *Davila*, 542 U.S. at 210.  And although certain parts of the Settlement Agreement may not be governed by ERISA, a dispute over the terms of the specific benefit at issue here is. *See Stearns v. NCR Corp.*, 297 F.3d 706, 710 (8th Cir. 2002) (noting that if a non-ERISA

---

[3] The ERISA statute itself vests federal courts with original jurisdiction over ERISA claims.  *See* 29 U.S.C. § 1132(e)(1) ("State courts of competent jurisdiction and district courts of the United States shall have concurrent jurisdiction" over ERISA § 502(a)(1)(B) claims).

contract provides "benefits through a plan or program covered by ERISA, [ERISA] completely preempt[s] state law remedies for breach of contract" related to that specific benefit).

Accordingly, the Court will deny Nordling's Motion to Remand because the Complaint satisfies the well-pleaded complaint rule, and even if it did not, Nordling's state-law claims are pre-empted by ERISA.

## II.  MOTION TO DISMISS

Defendants move to dismiss Counts I and II on the grounds that the claims are pre-empted.  Because the Court has already found that Nordling's state law claims are pre-empted by ERISA, the Court will grant Defendants' Motion to Dismiss Counts I and II under Rule 12(b)(6) for failure to state a claim.  *See id.* (discussing pre-emption of state law claims seeking to enforce ERISA benefits).

## III. MOTION FOR SUMMARY JUDGMENT ON ERISA CLAIMS

Turning to Nordling's remaining claim—Count III under ERISA—Defendants move for summary judgment arguing that the Committee's decision to deny Nordling the Pension Make-Up Benefit was reasonable.

### A.  Standard of Review

A defendant can bring a motion for summary judgment under Rule 56 at "any time."  Fed. R. Civ. P. 56(b).  Summary judgment is appropriate where there are no

genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**B.  Standard of Review for Administrator's Decision to Deny the Pension Make-Up Benefit to Nordling**

The Court must also "identify the applicable ERISA summary judgment standard," specifically whether it should review the benefit plan de novo or with deference to the administrator's decision.  *Ravenscraft v. Hy-Vee Employee Benefit Plan & Tr.*, 85 F.3d 398, 402 (8th Cir. 1996).  This determination affects not only the legal standard to be applied, but whether evidence outside the administrative record may be considered.  *Id.*  If deference is given, "additional evidence gathering is ruled out."  *Brown v. Seitz Foods, Inc., Disability Benefit Plan*, 140 F.3d 1198, 1200 (8th Cir. 1998).  If the Court reviews the decision *de novo*, it may admit additional evidence only upon a showing of good cause.  *Id.*

When reviewing top hat plans that include a clause granting the plan administrator discretion, the Court applies deference, reviewing the administrator's decision for reasonableness, using normal principles of contract interpretation. *Bender v. Xcel Energy, Inc.*, 507 F.3d 1161, 1164, 1167 (8th Cir. 2007) (reviewing the same Deferred Compensation Plan at issue here under a reasonableness standard). Under the reasonableness standard, the administrator's decision will be upheld if it is supported by substantial evidence. *Wakkinen v. UNUM Life Ins. Co. of Am.*, 531 F.3d 575, 583 (8th Cir. 2008). The substantial evidence standard is met when "more than a scintilla but less than a preponderance" of evidence supports the administrator's decision. *Id.* (*quoting Woo v. Deluxe Corp.*, 144 F.3d 1157, 1162 (8th Cir. 1998) *abrogated on other grounds by Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115–16 (2008)). In short, the Court must uphold the administrator's decision when evidence exists that would allow a reasonable person to rule as the administrator did. *Id.*

The Court will review the committee's decision for reasonableness because Section 11(A) of the Deferred Compensation Plan grants the plan administrator and the committee the discretion "to interpret and resolve all questions arising under" the Deferred Compensation Plan. (Deferred Compensation Plan § 11(A)); *see also Bender*, 507 F.3d at 1164, 1167.

**C. Whether the Committee's Decision to Deny Nordling the Make-Up Benefit was Reasonable**

Nordling argues the Committee's decision to deny him the Pension Make-Up benefit was unreasonable for three reasons: (1) because of the terms of the Settlement Agreement; (2) because of a conflict of interest based on Nordling's 1990s state employment action; and (3) because Defendants pay the benefit to other, similarly situated beneficiaries, and are inconsistently interpreting the terms by denying Nordling the benefit.

First, Nordling's reliance on the Settlement Agreement is misplaced.  As mentioned above, the Settlement Agreement entitles Nordling to all the benefits he would have received under the Wealth-Op Plan had he not been fired.  Therefore, the terms of the Wealth-Op Plan control.  *See Stearns*, 297 F.3d at 710 (noting that if a non-ERISA contract provides "benefits through a plan or program covered by ERISA, [ERISA] completely preempt[s] state law remedies for breach of contract" related to that specific benefit).  Under the clear terms of the Wealth-Op Plan, Nordling is not entitled to the Pension Make-Up benefit.  The Make-Up benefit is included in § 7 of the Deferred Compensation Plan, to which the Wealth-Op is an addendum.  Though some of the terms of the Deferred Compensation Plan apply to the Wealth-Op Plan, both plan documents clearly state that § 7 of the Deferred Compensation Plan does not apply to the Wealth-Op Plan.

Second, even presuming a conflict of interest based on Nordling's prior action nearly 30 years ago, Nordling presents no evidence showing the conflict affected the committee's decision as the plain language of the Wealth-Op Plan shows the committee's decision to deny Nordling the benefit was reasonable.[4]

Third, Nordling presents no evidence, in the administrative record or otherwise, showing inconsistent application.  And even if he had presented new evidence, that evidence would be outside the scope of the Court's deferential review.  *See Seitz Food, Inc.*, 140 F.3d at 1200 (noting "additional evidence gathering is ruled out on deferential review").

That said, some of the Committee's listed reasons for denying the benefit seem contrary or inapplicable to the clear terms of both Plans.  For example, it is unclear what statute of limitations the committee is referring to that would prevent Nordling from raising his claim, why the committee relied on papers provided to pensioners from the early 1990s when Nordling's employment with NSP ended in 1987, or why the committee invoked § 7(E) as a reason for denial at all, given that the clear terms of the Wealth-Op Plan state that § 7 of the Deferred Compensation Plan is inapplicable to Wealth-Op Plans.  However, the third reason the company gave—that company records do not support

_____

[4] Whether a conflict of interest exists and whether NSP is applying the terms of the Wealth-Op Plan in an inconsistent manner are factors to consider when determining the reasonableness of the denial decision.  *See Metro. Life Ins. Co.*, 554 U.S. at 115.

Nordling's eligibility—is sufficient.  The internal NSP memo from 1992 states that the intent of the settlement agreement was to restore Nordling to his chosen benefit—the Wealth-Op Plan—and ensure that he did not receive the Pension Make-Up benefit included in § 7.  Moreover, as already noted, the Wealth-Op Plan's clear terms do not support Nordling receiving the benefit.  A reasonable person therefore could have, and likely would have, found just as the Committee did: that Nordling, as a Wealth-Op Plan account holder, was not entitled to the Pension Make-Up benefit on those funds.

Even so, Nordling is entitled to the Pension Make-Up benefit on any funds remaining in his Regular Deferred Benefit Account that was created upon his termination.  The evidence shows that per the settlement agreement, all but $412.28 was left in a Regular Deferred Compensation account.  (Robin Decl. ¶ 5, Ex. D at 14.)  Though it is unclear if those funds remain in a Regular Deferred Benefit Account, the Court will Order NSP to provide Nordling with evidence of the amount remaining in that account, if any, and provide him with the Make-Up Benefit on those funds.  The Court will otherwise grant Defendants' Motion for Summary Judgment on Count III.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion to Remand [Docket No. 19] is **DENIED;**

2.      Defendants' Motion to Dismiss [Docket No. 25] is **GRANTED** as to Counts I and II;

3.      Defendants' Motion for Summary Judgment [Docket No. 25] is **GRANTED in Part and DENIED in part**.  NSP must provide Nordling with an accounting of his Regular Deferred Compensation Plan and pay Nordling the Make-Up Benefit on any funds remaining in that account.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 25, 2020
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court